UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────────

| | |
|---|---|
| KELLI D. HAKE and MATI GILL, | Index No. 19-mc-00024 (VEC) |
| Plaintiffs, | DECLARATION OF STEVEN B. FEIGENBAUM IN PARTIAL OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL COMPLIANCE WITH NON-PARTY SUBPOENAS AND IN SUPPORT OF CROSS-MOTION FOR A PROTECTIVE ORDER |
| -against- | |
| CREDIT SUISSE AG, WELLS FARGO BANK, N.A., THE BANK OF NEW YORK MELLON and ING FINANCIAL HOLDINGS, LLC, | |
| Defendants. | |

───────────────────────────────────────────────

STEVEN B. FEIGENBAUM, pursuant to 28 U.S.C. § 1746, declares the following to be true under penalty of perjury:

1. I am a member of Katsky Korins, LLP, counsel for The Bank of New York Mellon ("BNYM") in this miscellaneous proceeding. I submit this declaration in (a) support of BNYM's partial opposition to plaintiffs' motion, filed on January 15, 2019, to compel compliance with (i) two subpoenas, each dated November 2, 2017 (the "Gill Subpoenas"), issued by plaintiff Mati Gill ("Gill"), and (ii) a separate subpoena, dated May 10, 2018 (the "Hake Subpoena"), issued by multiple plaintiffs groups whose first named plaintiff is Kelli D. Hake ("Hake"); and (b) in support of BNYM's cross-motion for a protective order under Fed. R. Civ. P. 26(c) or 45(d)(3). In particular, I set forth the facts underlying BNYM's partial opposition and cross-motion. I am familiar with the facts by virtue of having served as BNYM's lead counsel during most of the relevant time period since the subpoenas were served.

A. <u>The Underlying Proceedings in Which the Subpoenas Were Issued</u>

2. The Gill and Hake subpoenas were issued in connection with two separate underlying proceedings, in the United States District Court for the District of Columbia, entitled *Mati Gill v. Islamic Republic of Iran*, No. 15-cv-2272 (D.D.C.), and *Kelli D. Hake, et al., v. Bank Markazi Jomhouri Islami Iran, et al.*, No. 17-cv-114 (D.D.C.). BNYM is not a party to either proceeding. In *Gill*, the sole plaintiff, Gill, has obtained a judgment against the Islamic Republic of Iran ("Iran") and is now seeking to enforce his judgment. In *Hake*, several dozen plaintiffs have sued three agents of Iran – Bank Markazi (the central bank of Iran), Bank Melli and National Iranian Oil Company – that are alleged to have provided support for certain terrorist activities. The Hake plaintiffs have not yet obtained, and are still pursuing, a judgment against the defendants, all of which have failed to appear and are in default.

3. The Hake plaintiffs, represented by the same firm, Osen LLP, that represents them in *Hake* and that represents Gill, are also among the plaintiffs in an action brought in November 2014, in the Eastern District of New York, against nine international banks – eight Asian and European banks and one Iranian bank (Bank Saderat) – alleged to have provided material aid to Iranian-supported terrorist activities by processing U.S. dollar transactions between 2003 and 2010. *See Freeman v. HSBC Holdings PLC*, No. 14-cv-6601 (E.D.N.Y. Nov. 10, 2014). By order entered January 16, 2015, discovery in *Freeman* was stayed pending a decision on the banks' motion to dismiss. *See* Min. Entry, *Freeman v. HSBC Holdings PLC*, No. 14-cv-6601 (E.D.N.Y. Jan. 16, 2015). Although Magistrate Judge Pollak in *Freeman* recommended that the banks' motion be denied, Judge Irizarry has not yet ruled on the banks' objections. *Freeman*, No. 14-cv-6601, 2018 WL 3616845, at *1 (E.D.N.Y. July 27, 2018). Nor, as of the time of this filing, has the Court lifted the stay of discovery.

B.   The Nature of the Gill and Hake Subpoenas

4.   On or about November 2, 2017, Gill served BNYM with the first of his two subpoenas (the "First Gill Subpoena," annexed as Ex. 1), seeking records of transactions – involving one or more of 14 separate entities and individuals, plus about 75 aliases and alternate spellings – that occurred between January 1, 2003 and December 31, 2010 (the "Relevant Timeframe").[1] At or around the same time, Gill served BNYM with a second subpoena (the "Second Gill Subpoena," Ex. 2), seeking records of transactions during the Relevant Timeframe involving any one or more of 45 separate entities and individuals, plus about 50 aliases and alternate spellings.  And on or about June 27, 2018, the Hake plaintiffs served BNYM with the Hake Subpoena (Ex. 3), seeking records of transactions during the Relevant Timeframe involving any one or more of 5 entities and individuals listed as Subject Entities, plus about 50 aliases and alternate spellings.  (The entities and individuals identified in the Gill and Hake subpoenas are referred to here, as they are in the subpoenas, as "Subject Entities.")

5.   The ostensible objectives of the Gill and Hake subpoenas, as has been stated by plaintiffs' counsel, are as follows:  in *Gill*, to obtain information that can be used to help locate assets of Iran, or of instrumentalities thereof, on which Gill can execute to help enforce his judgment; and in *Hake*, to obtain information that can help the Hake plaintiffs obtain a judgment against the Iranian entities named as defendants.

6.   BNYM, however, questions those objectives.  As to Gill, counsel has never plausibly explained how information about transactions that took place between 2003 and 2010 could realistically lead to the discovery of assets today on which Gill can execute.  And as to Hake, the Hake plaintiffs' counsel has acknowledged that non-party discovery from banks like

---

[1]   References to "Ex. __" are to the exhibits to this declaration.  References to "Filitti Decl." are to the January 15, 2019 moving declaration of Gerard Filitti, one of plaintiffs' lawyers at the Osen firm.

BNYM is not necessary to obtain a judgment against the defendants in *Hake*. Thus, as counsel told the *Hake* court during a hearing held on April 17, 2018:

> Mr. Osen: ". . . I would say to you that we would either, <u>by expert or by affidavit</u>, submit sufficient evidence to support the claims against the [Iranian] banks. Based on the fact that we have additional time, I would ask Your honor to consider whether you'd be open to limited discovery for those claims. <u>Again, it was probably not necessary. I can't represent that without it, we can't make our case, but, you know, typically in an FSIA action, these submissions are based on government findings alone – government records and reports and the like – and expert testimony and not the actual transactional records involved.</u>" [Ex. 4, Transcript of April 17, 2018 hearing, at 23:17-24:2 (emphasis added)]

Because the Hake plaintiffs do not need the subpoenaed banks' information to obtain their judgment, BNYM and other subpoenaed banks have reason to believe that the information they provide in response to the Gill and Hake Subpoenas is in reality meant to be used in *Freeman* or used to bring similar claims against banks not now parties in *Freeman*.

7. Further, unlike the many other subpoenas that have in the past been served on BNYM by judgment creditors of Iran and other foreign states designated as Specially Designated Nationals ("SDNs") by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), the Gill and Hake subpoenas call not only for blocked assets of the foreign state at issue (and its instrumentalities), but also for transactions – all or virtually all of which are wire transfers – that went through. At BNYM and other banks involved in international wire transfers subject to sanction regulations administered by OFAC, the blocking of a wire transfer results in the creation of a blocked account that judgment creditors may potentially attach to help enforce their judgment. A completed, unblocked wire transfer results in no such blocked account.

8. Of the 59 Subject Entities identified in the First and Second Gill Subpoenas, most are believed to have been designated by OFAC as SDNs pursuant to sanctions regulations in place at various times between 2007 and 2010. Iran, meanwhile, was separately subject to

various sanctions throughout the entire Relevant Timeframe. Those sanctions barred BNYM and other U.S. banks and foreign banks doing business in the U.S. from processing transactions involving Iranian entities and from having direct correspondent relationships with Iranian banks.

C. The Negotiations of and Eventual Entry into a Protective Order

9. As it routinely does before it discloses confidential information in response to a subpoena, BNYM sought to put a protective order in place before complying with the Gill and Hake subpoenas. But the negotiations of a protective order, which were handled for BNYM by one of its in-house lawyers, were difficult due to plaintiffs' insistence on having limited restrictions on their ability to use information disclosed in response to the subpoenas. Rather than limit the use of such information solely to the proceedings (*Gill* and *Hake*) in which the subpoenas were issued – as is typical of protective orders in the non-party subpoena context – plaintiffs wanted the ability to use the information in other contexts as well. As evidenced by various emails from BNYM's in-house counsel to plaintiffs' counsel, any such unrestricted use of BNYM's disclosed information was of concern to BNYM. (*See* Filitti Decl., Ex. P, emails from Jessica Rhea to Michael Radine on May 23, June 13 and June 20, 2018.)

10. The parties eventually entered into a protective order, entitled "Protective Order and Agreement" (Ex. 5), on or about June 26, 2018, and the protective order was signed by the *Gill* court on June 28, 2018 and the *Hake* court on July 7, 2018. The protective order's final language did not, however, fully assuage BNYM's concerns. Paragraph 4 of the protective order states that "Confidential Information shall not be used or disclosed for any purpose other than *in relation to* Plaintiffs' claims against the defendant or defendants in the *Gill* and *Hake* actions." (Ex. 5 at ¶4 (emphasis added)) Although that paragraph limits the use to which plaintiffs can put information disclosed by BNYM, BNYM remains concerned that plaintiffs will construe the use

5

restriction broadly enough to enable them to use disclosed information in *Freeman* or otherwise in a way that is adverse, directly or indirectly, to BNYM's interests or those of banks for which it provides correspondent banking services.

D.     BNYM's Productions of Spreadsheets Detailing
Transactions Responsive to the Gill and Hake Subpoenas

11. On June 26, 2018, right after the parties had entered into a protective order, BNYM produced spreadsheets, which by then had already been prepared, collectively containing 131 individual transactions responsive to both the First and Second Gill Subpoenas. These spreadsheets encompassed results from searches BNYM conducted of all Subject Entities, including alternate spellings and aliases, identified in both the First and Second Gill Subpoenas. To maintain the confidentiality of its most sensitive records, BNYM redacted certain fields in its productions, including account numbers – particularly of banks with which BNYM has a correspondent banking relationship – addresses and certain records that BNYM maintains solely for internal purposes and are independent of the salient information for a given wire transfer.[2]

12. On February 28, 2019, BNYM produced spreadsheets containing transactions responsive to the Hake Subpoena. As it did in generating the spreadsheets produced in response to the Gill Subpoenas, BNYM, to comply with the Hake Subpoena, did searches of all of the Subject Entities identified in the subpoena, and the spreadsheets it produced contained information about a total of 2,218 wire transfer transactions to which one or more of those Subject Entities were a party. BNYM redacted the same fields in the spreadsheets that it had redacted in its spreadsheets produced in response to the Gill subpoenas.

---

[2]     A more detailed description of BNYM's efforts to comply with the Gill and Hake Subpoenas is set forth in the accompanying July 24, 2019 declaration of Carrie Sears, a Vice President and Compliance Manager in BNYM's Funds Transfer Special Investigations group. I do not repeat that description here.

E.  Plaintiffs' Filing of This Motion to Compel, Their Repeated Requests for Further Information from BNYM, and BNYM's Efforts to Meet Those Requests

13. On January 15, 2019, with no advance notice to BNYM, plaintiffs filed their motion to compel BNYM's and three other banks' compliance with the Gill and Hake Subpoenas. Shortly thereafter, in early February 2019, my firm began interacting with plaintiffs' counsel on BNYM's behalf. On February 13, 2019, this Court granted the parties' joint request to stay the motion to compel, as to BNYM, to March 25, 2019. (ECF Doc 20)

14. On March 18, 2019, after hearing nothing from plaintiffs since BNYM's production of spreadsheets on February 28, I emailed plaintiffs' counsel, Mr. Filitti, saying that absent anything to the contrary, BNYM assumed plaintiffs deemed BNYM to be in compliance with the Gill and Hake Subpoenas, that plaintiffs' motion to compel would be withdrawn as to BNYM, and that BNYM therefore need not oppose the motion. (Ex. 6 (Exchange of emails between Steven B. Feigenbaum and Gerard Filitti on March 18 and 20, 2019))

15. On March 20, 2019, Mr. Filitti replied to my March 18 email, purporting to note "significant deficiencies" in BNYM's productions. Mr. Filitti complained of BNYM's redactions of certain fields; requested "with respect to each SWIFT message associated with a Subject Entity . . . the production of the data contained in the following fields (including any subparts): 1-3, 5, 13, 20, 21, 23, 25, 26, 28, 30, 32, 33, 36, 50-59, 70-72, 75-77, 79, 82, 83, 87 and 94"; further requested that "BNY supplement its production by either populating a spreadsheet with these fields from its database, or produce the SWIFT messages themselves"; asked that BNYM identify whether it searched for messages from SWIFT's nine message series; and requested that BNYM identify whether its production included records relating to payment orders for the Subject Entities that were blocked, frozen or rejected. Mr. Filitti's email did not say why plaintiffs needed that information or otherwise how the information was relevant to

7

Gill's judgment enforcement efforts or the Hake plaintiffs' efforts to obtain a judgment against the Iranian agents sued in *Hake*. (Ex. 6, email of March 20, 2019)

16. The next day, March 21, the parties submitted a second joint status report to the Court stating that they were exploring a mutual resolution of their dispute and requesting a further stay of the motion to compel to April 19, 2019. The Court granted that request the following day. (ECF Doc 35)

17. On April 5, 2019, under cover of a letter from me to Mr. Filitti sent by federal express (Ex. 7), BNYM produced a revised series of spreadsheets, responsive to the Hake Subpoena, that addressed the alleged deficiencies identified in Mr. Filitti's March 20 email. Departing from its normal practice, and solely in an effort to resolve its dispute with plaintiffs once and for all, BNYM unredacted the previously redacted fields in the Hake spreadsheets. My April 5 letter also answered the various questions that Mr. Filitti had raised in his March 20 email regarding BNYM's productions.

18. On April 15, 2019, having heard nothing from plaintiffs since BNYM's April 5 production, I sent Mr. Filitti an email saying that, in light of BNYM's having remedied the prior alleged deficiencies in its productions, plaintiffs' motion to compel should be withdrawn as to BNYM. (Ex. 8 (Exchange of emails between April 15 and May 15, 2019; *see* April 15 email.)

19. Two days later, on April 17, Mr. Filitti responded by requesting that BNYM produce yet more new data, including additional SWIFT message data for each of the 2,218 transactions disclosed in compliance with the Hake Subpoena. He also requested that BNYM remove all redactions from its spreadsheets produced in response to the Gill Subpoenas (Ex. 8, email of April 17), following up with an email on April 20 (Ex. 9) requesting unredacted transactions for the nine Subject Entities, identified in the Gill Subpoenas, for which there had

8

been transactions responsive to those subpoenas. Neither of Mr. Filitti's emails said why that newly requested information is relevant to Gill's judgment enforcement efforts or the Hake plaintiffs' efforts to obtain a judgment against the Hake defendants.

20. On April 19, 2019, the parties submitted another joint status report to the Court, noting that their discussions were ongoing and requesting that the stay of plaintiffs' motion be extended to May 17, 2019. The Court granted that request on April 22. (ECF Doc 46)

21. By this time, BNYM had become increasingly concerned that releasing sensitive account information to plaintiffs posed too high a risk of damaging its relationships with banks for which it provides correspondent banking services. The Osen firm has never represented that it would not use any such information in *Freeman* or otherwise in a way that would be detrimental, directly or indirectly, to BNYM's interests. That a protective order is in place does not eliminate BNYM's concerns, since BNYM fears that plaintiffs will construe the order, however inaccurately, as allowing them room to use disclosed information outside the context of the *Gill* and *Hake* proceedings. Nor have plaintiffs ever articulated how such confidential information as account numbers – particularly from a time period dating back to 2003-2010 – will help Gill enforce his judgment against Iran or help the Hake plaintiffs obtain a judgment against the Iranian defendants in *Hake*.

22. On May 15, 2019, I sent an email to Mr. Filitti answering the questions he had raised in his April 17 email and noting that, as to certain additional information requested by plaintiffs, BNYM does not necessarily have the information insofar as it is typically an intermediary bank in a wire transfer chain and has no control over the data received from the originating bank preceding it in the chain. (*See* Ex. 8, email of May 15) My email also reiterated that BNYM would not provide wholesale unredacted versions of the spreadsheets it

had produced as to the nine Subject Entities identified in his April 20 email, but that it would entertain requests made on a case-by-case basis to unredact information as to a given transaction. The email explained BNYM's rationale for its position as follows:

> As to the nine Subject Entities identified in your 4/20 email, BNYM will not provide unredacted versions of the spreadsheets it has already produced. Although BNYM previously produced unredacted versions of spreadsheets of most of the transactions responsive to the Hake subpoena, it did so reluctantly and contrary to its ordinary practice. The redacted information consists of confidential account numbers and addresses, and absent a compelling reason why plaintiffs need or could meaningfully use that information – and none has been conveyed to date – BNYM believes it would be inappropriate to disclose it even though a protective order is in place. That said, if you identify for us individual transactions whose redacted information is, you believe, legitimately relevant to the objectives of the Hake and Gill subpoenas – to obtain information to help satisfy the Gill judgment or to help obtain a judgment for the Hake plaintiffs – BNYM will address each such transaction one by one. Barring an independent reason not to do so, BNYM will then promptly unredact the pertinent information and provide it to you. [Ex. 8, email of May 15, 2019]

23. On May 17, 2019, the parties submitted another joint status report to the Court and requested a further stay of the motion to compel to June 14, 2019. The Court granted that request the same day. (ECF Doc 53)

24. For the next six weeks, I did not hear from plaintiffs' counsel. Finally, on June 25, 2019 (at 9:42 p.m.), after the Court had four days earlier extended the stay of plaintiffs' motion to July 22, 2019 (*see* ECF Doc. 59), Mr. Filitti responded to my May 15, 2019 email. After falsely accusing BNYM of "refusing to comply with the subpoenas," Mr. Filitti demanded that BNYM make a supplemental production of spreadsheets responsive to the Gill subpoenas; provide a "log showing the entities that it searched for and the keywords, terms and connectors it used in conducting these searches, along with the databases searched," ostensibly to "clarify whether BNYM's searches were complete and comprehensive"; remove redactions from those previously disclosed spreadsheets that had redacted certain fields; and provide information for

10

certain SWIFT fields (20 and 21) that BNYM does not normally provide.  Mr. Filitti did not say why the requested information was relevant to Gill's judgment enforcement efforts or the Hake plaintiffs' efforts to obtain a judgment.  As to the redacted spreadsheets, Mr. Filitti claimed that BNYM "lacks a compelling reason" to redact the fields in question, even though my May 15 email had specified why BNYM's redactions were proper despite the presence of a protective order.  Nor did his email acknowledge BNYM's representation that it would assess in good faith any request to unredact data on a transaction-by-transaction basis.  Although his mail, sent at 9:42 p.m., effectively came on June 26, and even though he had taken six weeks to respond to my May 15 email, Mr. Filitti demanded that BNYM respond to him within two days, by June 28. (Ex. 10, Exchange of emails on June 25 and 26, 2019; *see* June 25 email)

25.     After emailing Mr. Filitti on the morning of June 26, 2019 to ask that he stop misstating the facts regarding BNYM's compliance with the Gill and Hake subpoenas (Ex. 10, email of June 26), I sent him an email on June 27 setting forth BNYM's substantive response to his June 25 email:  (i) that BNYM would update all three sets of spreadsheets that it had previously produced, responsive to both the Gill and Hake subpoenas, to include the SWIFT fields 20 and 21 – a production that BNYM made on July 17, 2019; (ii) that BNYM would not remove its redactions from the transactions at issue, but would, as it had repeatedly already said, assess any request to unredact information about a given transaction on a case-by-case basis; and (iii) that BNYM would not provide a log of the entities it searched and the search terms it used, in part because the subpoenas do not call for a log, in part due to the burden of recreating searches done a year or year-and-a-half earlier, and in part because BNYM had already represented that it had searched every Subject Entity in the three subpoenas and had placed no restrictions on those searches other than certain minor restrictions, as to just three entities, that

11

had already been conveyed to plaintiffs in my May 15 email. (Ex. 11, Exchange of emails between June 25 and 28, 2019; *see* email of June 27)

26. By email the next day, June 28, Mr. Filitti responded to my June 27 email by saying that plaintiffs continued to insist on a log and on the unredacting of the spreadsheets responsive to the Gill subpoenas, and proposing a briefing schedule on plaintiffs' motion to compel. (Ex. 11, email of June 28) The parties were then at an impasse, necessitating that BNYM submit this partial opposition to plaintiffs' motion and cross-motion for a protective order.

Dated: New York, New York
July 31, 2019

                                                                         STEVEN B. FEIGENBAUM