# **<u>EXHIBIT 4</u>**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

KELLI D. HAKE, et al.,

                           CA No. 1:17-cv-00114-TJK

       Plaintiffs,

                           Washington, D.C.

v.                         Tuesday, April 17, 2018

                           10:00 a.m.

BANK MARKAZI JOMHOURI ISLAMI

IRAN, et al.,

       Defendants.

- - - - - - - - - - - - - - - - x
_____

TRANSCRIPT OF STATUS CONFERENCE
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


For the Plaintiffs:  Gary M. Osen, Esq.
                     OSEN LLC
                     2 University Plaza
                     Suite 402
                     Hackensack, NJ 07601
                     (201) 265-6400


Court Reporter:     Timothy R. Miller, RPR, CRR, NJ-CCR
                     Official Court Reporter
                     U.S. Courthouse, Room 6722
                     333 Constitution Avenue, NW
                     Washington, DC 20001
                     (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                    <u>P R O C E E D I N G S</u>

2              THE DEPUTY CLERK:  Your Honor, this is civil

3    matter 17-114, Kelli D. Hake, et al., v. Bank Markazi, et

4    al.; and civil matter 17-737, Joshua Brooks, et al., v. Bank

5    Markazi, et al.

6              Counsel, would you please approach the podium and

7    state your appearance for the record.

8              MR. OSEN:  Good morning, Your Honor.  Gary Osen

9    for the Hake and Brooks plaintiffs.

10             THE COURT:  Good morning, Mr. Osen.  Welcome back.

11             And I'll note for the record that we do not have

12   anyone here representing anyone -- any of the defendants.

13             So welcome back, as I said.  I hoped we could -- I

14   hope we can make some progress, although I know the

15   procedural posture here of the case is not ideal -- I guess

16   I'll put it that way -- in terms of the related -- well, the

17   potentially related cases floating around that would be more

18   efficient to try to handle in as coordinated a manner as

19   possible.  So let me -- I have a couple questions I wanted

20   to ask, and then I'll -- happy to hear your concerns if we

21   don't hit them, and then we'll see if we can't at least try

22   to move the ball forward to some degree today.  Does that

23   seem reasonable?

24             MR. OSEN:  Absolutely, Your Honor.

25             THE COURT:  All right.  First on the Field case --

1    which, I know, is one of the cases we didn't even set

2    today -- do you -- when do you anticipate service or do you

3    anticipate service anytime soon?

4          MR. OSEN:  Right.  Your Honor, with respect to

5    Field, the impediment to service is just completion of the

6    translation required into Farsi.  We anticipate that being

7    completed at the end of this week.  And our estimate is that

8    based on the prior proceedings in Hake and Brooks that the

9    actual default, assuming the defendants don't appear in that

10   case, would occur in early to mid-August.

11         THE COURT:  Okay.  And to the extent -- well, to

12   the extent you're able to say -- well, let me ask this

13   first.  Hake, Brooks and Field, then, are all, fair to say,

14   very similarly situated in terms of -- obviously, different

15   plaintiffs, but different -- similar -- same defendants --

16   the same set of or a very similar set of attacks -- events

17   at issue?

18         MR. OSEN:  Yes, the liability elements are

19   identical.  In fact, they're literally verbatim the same.

20   The only reason that there are multiple cases is because of

21   the unique aspects of service under the FSIA statute.  You

22   can't simply amend because it's a default with the

23   sovereign.  So when there's a cumulative number of

24   additional plaintiffs, the safer course is to simply file a

25   new action and serve again through that process.  So

1　essentially, they're the same case but with three docket

2　numbers.  And, obviously, the last case, Field, has not gone

3　through that additional service and default process.

4　　　　　　THE COURT:  Okay.  Is there -- to the extent you

5　can say or know, do you anticipate more cases, kind of,

6　along these lines coming down the pike anytime soon that you

7　might bring?

8　　　　　　MR. OSEN:  It's impossible to know for sure

9　because the actual universe of individuals who fit the broad

10　parameters of the legal theory are substantially larger than

11　ours.  There are a couple of other pending cases brought

12　after ours by firms that follow the same work who have cases

13　pending in this district before other judges.  So I don't

14　know what the ultimate total universe is.

15　　　　　　THE COURT:  Sure.

16　　　　　　MR. OSEN:  They have certainly not made an effort

17　to consolidate or to file them as related to our cases.  So

18　I surmise that they will be content to work off of whatever

19　submissions we --

20　　　　　　THE COURT:  Right.

21　　　　　　MR. OSEN:  -- make, but it's entirely --

22　　　　　　THE COURT:  Right.

23　　　　　　MR. OSEN:  -- possible that they'll, at some

24　point, move to consolidate, as well.

25　　　　　　THE COURT:  I just meant in terms of you and your

1      --

2              MR. OSEN:  Yeah.  I mean --

3              THE COURT:  I mean, again, as you say, who -- if

4      other plaintiffs came to you --

5              MR. OSEN:  Right.

6              THE COURT:  -- and they were properly situated,

7      you would bring them, but --

8              MR. OSEN:  Right.  And, in fact, in -- within the

9      Field case, Your Honor, there are family members of

10     plaintiffs in the prior cases who decided sometimes there

11     are emotional and other issues that determine when or if

12     they decide to participate.

13             THE COURT:  When you mentioned the other cases

14     with the same theory that are floating around in this

15     courthouse with attorneys other than you, do you mean

16     similar to Karcher -- or are they bank cases or cases

17     directly against Iran or both?

18             MR. OSEN:  My recollection is both.

19             THE COURT:  Okay.

20             MR. OSEN:  I will say -- although not perhaps

21     germane to Your Honor's question -- that we have spurred a,

22     sort of, mini subarea by our initial filing, beginning with

23     Karcher and then with Hake.  There have been a number of

24     other cases that have followed suit.  So I have lost track

25     of the number of them, but there are certainly a half-dozen

1    or so.

2              THE COURT:  Okay.  And is it fair to say that the

3    first -- the oldest of this whole set of cases is the

4    Karcher case?

5              MR. OSEN:  Yes.

6              THE COURT:  Okay.  To the extent you, you know --

7    as I try to figure out -- I have at least one other FSIA

8    case that is older than even any of yours --

9              MR. OSEN:  Right.

10             THE COURT:  -- that I want to try to move -- make,

11   you know -- move first, just because of the oldness of it.

12   And, you know, obviously, Judge Kotelly has had the Karcher

13   case for quite a while.  Do you -- I've looked at the docket

14   in that case.  Do you plan -- and I know my understanding

15   of, sort of, how this came about was you all, I think, when

16   this case -- when these cases -- Hake and your other

17   cases -- were filed, you had requested that they be

18   consolidated with Karcher and -- or as related to Karcher

19   and Judge Kotelly thought otherwise; is that -- is my memory

20   correct?

21             MR. OSEN:  Well, I can't speak to whether it was

22   Judge Kollar-Kotelly or the Clerk's --

23             THE COURT:  Or just the --

24             MR. OSEN:  -- office or --

25             THE COURT:  Okay.  Okay.

```
 1                    MR. OSEN:  -- whatever, but --

 2                    THE COURT:  Fair enough.

 3                    MR. OSEN:  -- yes, we did file them as related,

 4          but they ultimately got --

 5                    THE COURT:  Right.

 6                    MR. OSEN:  -- dispersed and I believe Judge

 7          Lamberth has --

 8                    THE COURT:  Yes.

 9                    MR. OSEN:  -- one of those.

10                    THE COURT:  That's right.  Yeah.  Do you -- to the

11          extent you want to say, have you thought about moving before

12          Judge Kotelly to consolidate these other ones?  Obviously,

13          it would be her -- that's the oldest case.  It would be her

14          decision and not mine or any other judge's and that's a --

15                    MR. OSEN:  Yeah.

16                    THE COURT:  -- kind of, a litigation strategy

17          question that I wouldn't blame you if you didn't want to say

18          now, but I'm trying to get a sense of --

19                    MR. OSEN:  Right.

20                    THE COURT:  -- you know, whether that's likely to

21          happen.

22                    MR. OSEN:  Your Honor, all I can say is that we've

23          advised both chambers of the, sort of, parallel proceedings.

24          From our standpoint, it's not really a, sort of, strategic

25          question.  It's simply that, you know, our interest is in
```

1   having the cases presented in some court and there's also an

2   added element that the -- as the Court may be aware, there's

3   something called the U.S. Victims of State Sponsored

4   Terrorism Fund/Act.  The actual official name -- I had to

5   write it down because they're strangely different.  The act

6   is actually the Justice for Victims of State Sponsored

7   Terrorism Act, 42 U.S.C. 10609, and that created a fund in

8   2015 wherein civil forfeitures that the United States

9   Department of Justice collected in various state-sponsored

10  sanctions cases would be, in part, deployed to pay out on

11  some of these judgments.  And so obviously, the Hake

12  plaintiffs and the Karcher plaintiffs are too late for the

13  original filings back in 2016, but the fund has a new, sort

14  of, payment schedule beginning in, I think, January 1st of

15  2019.  So it had been our hope last year to obtain a

16  judgment to the extent the evidence supports it in time for

17  them to be able to apply to the fund.

18        Realistically, I'm not sure that's still possible

19  in either Karcher or Hake, at least not for all of the

20  plaintiffs.  It's conceivable that if Your Honor or Judge

21  Kollar-Kotelly were able to separate at least the estate or

22  wrongful death claims from those of the injured, those

23  conceivably, I suppose, could be administered still in this

24  calendar year only because, typically, courts in this

25  district have used a fairly straightforward formula for

1   assessing damages in those kinds of cases, unless, for

2   example, you have, as we do occasionally, a plaintiff who

3   didn't die instantaneously and there's issues of how long

4   they survived and their individual suffering, but in most

5   wrongful death cases, it's a fairly established formula

6   which doesn't necessarily necessitate a special master or a

7   more involved damages finding.  Obviously, with respect to

8   soldiers who were wounded in these cases, there's no

9   avoiding a case-by-case workup.  So it may be at least

10   conceivable that we might be able, with the Court's

11   indulgence and consent, to obtain a partial judgment at

12   least -- full judgment but for a subset of the plaintiffs

13   who could still be eligible under the program.

14           THE COURT:  The program ends at a certain point?

15   You had, sort of, said it -- I thought you said it begins in

16   '19.

17           MR. OSEN:  Yes.  It's a fairly unusual

18   administrative formula, as I understand it; that is, as I

19   understand the special master appointed, every two years or

20   so, they take whatever funds are in the fund at that time

21   and deal with the applications then pending and they exhaust

22   the fund and then, thankfully, there are many corporations

23   that conduct sanctions evasion and are caught by the

24   government and, therefore, the fund is periodically

25   replenished by new tortfeasors.  So it's not to say that if

1   they don't submit or have a judgment before December 31st,

2   they will forever be barred.  They'll just be subject to

3   whatever law enforcement may someday further discover in

4   future cases.

5          THE COURT:  Okay.  Could I ask you about the -- so

6   putting aside, then, the fact that you've got Field coming

7   which would be -- it would be, you know, in a perfect world,

8   handled with these matters --

9          MR. OSEN:  Sure.

10          THE COURT:  -- Karcher is out there beyond my

11   control, older case, a little further developed in terms of

12   what you've filed with Judge Kotelly.  The -- obviously, the

13   difference between, you know, this judge -- between Karcher

14   and this case is the bank issue.  Is there -- one thing, as

15   I'm getting up to speed just on how to do this efficiently

16   -- well, how to do it at all and how to do it most

17   efficiently, I think, you know, what I noticed was,

18   obviously, the bank being the delta between the Karcher case

19   and this case.  Could you talk a little bit about just what

20   you understand you have to prove in terms of the bank.  So

21   --

22          MR. OSEN:  Sure.

23          THE COURT:  -- you know, obviously, you have to --

24   I think it's -- as you had moved in the motion you have

25   pending, the -- or, maybe, you didn't move on the --

1      actually, on this fact -- on this point, but there are a lot

2      of cases that will establish that these banks were

3      instrumentalities of Iran.  But the issue being beyond that

4      in terms of these specific plaintiffs, what is the nexus?

5      In other words, is it enough to prove that the bank

6      materially supported terrorism?  And then do you have to --

7      what's the connection between the bank's financing of the

8      terrorism and the specific acts of terrorism in the case?

9      How close does that nexus have to be?  Are there courts out

10     there -- and I'll hear from you and I think, if it's -- if

11     it makes sense with you, I may ask you to submit something

12     just so I can, you know --

13             MS. OSEN:  Sure.

14             THE COURT:  -- I know that's the one issue that, I

15     think, is not as -- I don't want to say cookie cutter,

16     but is a little bit different than some of the other cases

17     I've seen -- to see, are there courts in this jurisdiction

18     or elsewhere that have said, Yes, you've gotten over the

19     hump, and what you had to prove?  And, maybe, some courts

20     have said, No, you weren't able to, kind of, connect those

21     dots.

22             MR. OSEN:  Right.  I think the elements of proof

23     are the same under the statute because, as instrumentalities

24     of Iran, the same elements under 1605A are present.  So it's

25     not that there's a heightened level of proximate cause or

1    scienter or anything like that; however, I think Your Honor

2    is driving at the question of whether it's simply sufficient

3    that they are alter egos or instrumentalities of Iran or did

4    they have to have some connection to the actual claims and

5    injuries in this case, and I think the answer is yes.  These

6    defendants were named in the complaint -- or I should say

7    complaints because of their role in facilitating financing

8    both to Hezbollah and to the Iranian Islamic Revolutionary

9    Guard Corps, the IRGC.  And those two organizations -- one

10   of which is simply an extension of Iran itself and the other

11   its willing agent -- are the primary parties responsible for

12   these attacks.

13        So our contention -- and it's based on government

14   findings and designations -- is that the Central Bank of

15   Iran centrally moved large sums of money through --

16   including Bank Melli -- large sums of money to the IRGC and

17   to Hezbollah and Iran actually generates most of that

18   dollar-denominated revenue that it shares with these

19   entities through sales of oil by the National Iranian Oil

20   Company which, during the relevant time period, the United

21   States Government found to be controlled by the IRGC itself.

22   So that's essentially the allegations in the complaints and

23   that is why they are tied directly and not, sort of,

24   incidentally by ownership to the allegations and the

25   injuries of the plaintiffs.

1    THE COURT:  So you would prove money directed from

2    -- by Iran through -- from the banks to Hezbollah, to the

3    IRGC and then connect those two groups to the attacks?

4    MR. OSEN:  Correct.  We don't profess to be able

5    to tie the specific funds transfers to particular attacks --

6    THE COURT:  Right.

7    MR. OSEN:  -- but certainly to the groups that

8    were instrumental in carrying them out.

9    THE COURT:  And that's a, sort of, chain of

10   causation, if you will, that is well-established, I assume,

11   in the -- I don't know -- how -- I shouldn't ask you this

12   leading question.  Are there, you know -- I -- obviously,

13   there are -- I know there's been -- there's a lot of case

14   law in this courthouse and elsewhere about Iran itself.

15   What is the universe of cases out there that you're aware

16   of -- I know you specialize in this work -- where they've

17   held these kind of banks liable on this theory as you've

18   described it?

19   MR. OSEN:  Well, there are a couple of cases both

20   in this Circuit and in the Second Circuit in the SDNY where

21   various entities -- including some subset of these

22   defendants, but others similarly situated -- have been found

23   liable in default cases for their involvement in supporting

24   Iran's terrorist activity.  In fact, one of those cases is

25   actually the FSIA component of the 9/11 litigation.  I think

1    it might be the Havlish case.  The issue with respect to

2    Iran itself or its instrumentalities in terms of the, sort

3    of, standard of pleading for causation is essentially the

4    same; that is to say, in some cases -- and this is one of

5    them, and the Marine barracks bombing case in Peterson is

6    another -- where Iran itself plays a direct and active role

7    in the commission of the attack.  That's not always the

8    case.  And I would say the majority of -- well, I hesitate

9    to quantify it, but a substantial number -- maybe, a

10   majority of the cases where Iran has been found liable, it's

11   been for giving support to other terrorist organizations

12   who, then, commit the attacks, and that may come in the form

13   of financial support or training, but not direction of the

14   attacks.

15         The Marine barracks case was one where the court

16   found that the IRGC actively assisted in the positioning and

17   structure of the bomb that was so effective and devastating

18   in that attack and here, too, for purposes of Karcher.  The

19   principal munition used, it was an EFP -- an explosively

20   formed penetrator -- which is a signature

21   Hezbollah-tested-and-designed but Iranian-manufactured

22   weapon.  So -- but the, sort of, levels of closeness in the

23   chain are, I think, at their heightened level when you're

24   dealing with Iranian operatives and agents participating in

25   the actual criminal acts, but in most cases, including

1    several in the last year or two in this court, the typical

2    Iranian FSIA case involves general support established by

3    Iran to groups like Hezbollah or Islamic Jihad or, for that

4    matter, al-Qaeda or other groups in which they've provided

5    financing generally or training or both.  And so under

6    1605A, the statute uses the same definition of material

7    support that is contained in the ATA -- in the

8    Anti-Terrorism Act, 2339A -- which is to say donations,

9    financial services, training, all of the, sort of,

10   activities that fall under the rubric of material support.

11   So in this case, the banks are in the same position.

12   They're providing material support to the entities and

13   individuals who facilitated the attacks which is squarely

14   within the -- within 1605A and the, sort of, general case

15   law on this issue.

16           THE COURT:  So it's almost, you know -- as you're

17   describing it, it's -- the state or the state-sponsored

18   entity provides support to the terrorist entity -- material

19   support -- and, after that, it's almost vicarious liability

20   for that terrorist activity.

21           MR. OSEN:  Yes, for the -- obviously, limited by

22   the foreseeability --

23           THE COURT:  Foreseeability --

24           MR. OSEN:  -- issue and --

25           THE COURT:  Yep.

1          MR. OSEN:  -- and this -- and, I think, general

2    proximate cause principles still apply.  De minimis support

3    or --

4          THE COURT:  Right.

5          MR. OSEN:  -- you know, if you gave $10 10 years

6    before is, obviously, the far end of the continuum.  The

7    closer in time, the more substantial the support, the more

8    foreseeable it is.

9          THE COURT:  Okay.  And, again, your -- and your

10   point being also that your theory here is actually more

11   direct than that, because you would have evidence of the

12   State of Iran being, you know, directly involved in some of

13   these attacks.

14         MR. OSEN:  Yes.  I mean, our contention is

15   supported by, I think, substantial government findings and,

16   depending on how it's presented -- either by affidavit or

17   live testimony -- from military/former military officials,

18   and people from the explosive ordnance disposal units, EOD,

19   in Iraq confirmed that the vast majority -- in the vast

20   majority of cases relevant to these complaints, the victim

21   was killed or injured by an EFP, and those are a very

22   specific signature weapon of the Iranians, without spoiling

23   the -- giving a spoiler alert here, the actual manufacturer

24   of these weapons.  They're sometimes mischaracterized in,

25   sort of, common parlance as IEDs which are improvised

1    explosive devices, but they're not improvised, and that's

2    why the Army and the U.S. military doesn't treat them as

3    such.  They are weapons-grade, precision-manufactured

4    devices that -- for various reasons in physics involving how

5    quickly C-4 and other high explosives heat and the type of

6    metal you have to use and the precise angling of the plates

7    that become the slugs that are used.  These are designed to

8    be armor killers, and they were tested by Hezbollah against

9    Israeli armor first and then deployed with lethal precision

10   in Iraq from roughly the end of 2004 to 2011 with

11   devastating effect --

12           THE COURT:  Yes.

13           MR. OSEN:  -- because, you know, the fatalities

14   and injuries resulting from these weapons was vastly greater

15   than that of the, sort of, what you would call improvised or

16   homemade explosives that were typically used by Sunni

17   insurgents and the like.  These were targeted and intended

18   to kill U.S. personnel.  And the U.S. Government, in --

19   through a variety of means, some which we can discuss and

20   some which are not public, felt and disclosed publicly that

21   these are unquestionably of Iranian origin, manufacture and

22   supply.

23           THE COURT:  Okay.  All right.  Can I ask you a --

24   so that's great.  That at least educates me as far as the

25   bank issue.  And it might make sense to have you just, sort

1    of, submit something along those lines --

2              MR. OSEN:  Absolutely.

3              THE COURT:  -- if we're going to be --

4    particularly since that's the piece of this that is

5    different than Karcher that I -- if I can educate myself; be

6    totally comfortable with that, it will save time going

7    forward, I think.

8              MR. OSEN:  We'll be happy to do that, Your Honor.

9              THE COURT:  Okay.

10              The other thing I have pending from you is the

11    motion to take judicial notice of facts.  And my question

12    about that is, as I read some of the cases it cites,

13    including the -- I think, the main case from Judge Lamberth

14    about this, as I understand it, the -- what a court is

15    permitted to do is look at the evidentiary -- I mean, I can

16    take judicial notice of the fact that an opinion exists, but

17    I've got to look at the evidentiary record.  I can take

18    judicial notice of the evidentiary record in a case and,

19    from that, make certain factual findings that obviate the

20    need for you to re-present the same evidence; is that a fair

21    statement?

22              MR. OSEN:  Yes.  I would just add to that, Your

23    Honor, that this is, sort of, a boilerplate requirement in

24    most FSIA cases that you make such a submission, kind of, on

25    the theory that it's always been done.  In practice, most of

1   the submissions on those kinds of issues involve the fact

2   that Iran is a state-sponsored-designated, and remains so,

3   or that Hezbollah is an FTO-designated under the Immigration

4   and Naturalization Act and so forth, things that, frankly,

5   are going to be repeated in the proceeding one way or the

6   other regardless.  So I think it's conceived of as a

7   timesaver and, maybe, in certain circumstances, it is, but

8   in practical terms for our case, we do it more as a

9   formality.  We don't anticipate, you know, the Court having

10  to depend on those kinds of notices when, you know, we make

11  those submissions in the ordinary course of the larger

12  presentation.

13          THE COURT:  Okay.  That makes sense.  I, you know

14  -- I don't like to have, you know, motions hanging out

15  there, you know?  I'd like to try to address them as soon as

16  I can.  And the thing that struck me as I read through it

17  was simply -- and I take your point that it was more, sort

18  of, a pro forma way of going about these cases.  If I was --

19  and I want to be as efficient and save time if I can, but I

20  would need to look at, I think, a broader, you know,

21  evidentiary record in each of those cases to, kind of --

22          MR. OSEN:  Sure.  Where this --

23          THE COURT:  -- check the box and say --

24          MR. OSEN:  Where this comes up a little bit is,

25  Your Honor, that -- especially in Peterson with the Marine

1    barracks, after Congress amended the statute and that

2    allowed additional plaintiffs to come in after the statute

3    of limitations.  The question presented to the original

4    Peterson court was -- and to any judge who had a similar

5    case was, do I have to put on all the evidence again or can

6    we take judicial notice of certain findings and so forth?

7    And so there are certainly circumstances where even though

8    evidence has to be established under the statute, you don't

9    want to reinvent the wheel.  Here, I think it's really not a

10   significant issue.  So almost anything we would -- I think

11   we were pretty sparse in what we put forward, but they're so

12   elemental as you would review it anyway.  So I don't think

13   it saves much time either way.

14            THE COURT:  Okay.  Okay.  But depending upon how,

15   you know, the Karcher case plays out --

16            MR. OSEN:  Then we might --

17            THE COURT:  -- we might have -- I mean, I, you

18   know -- in a perfect world -- well, not in a perfect world.

19   You're not going to put on all that evidence twice.  So you

20   know, that's why I would like to -- well, let's put it this

21   way.  Going forward, if you get word from Judge Kotelly

22   about how she's going to handle that -- of course, we'll be

23   watching the docket, too, but -- be sure to, I guess, file

24   something on our -- I'm sure you would, but --

25            MR. OSEN:  Right.

```
 1              THE COURT:  -- be sure to let us know.  You could

 2    call, but I think the easier thing to do is just file a

 3    one-page document that, whatever development happens

 4    there -- if she sets it for a particular day or time --

 5    whatever developments would be helpful --

 6              MR. OSEN:  Right.

 7              THE COURT:  -- to know.

 8              MR. OSEN:  Yeah.  From our standpoint, Your Honor,

 9    it's really not a great burden, especially on the papers, to

10    litigate each case, you know?  It -- the --

11              THE COURT:  Right.

12              MR. OSEN:  But it makes absolutely no sense from a

13    court standpoint.  So it's really -- this is -- litigants

14    always say they're concerned for judicial efficiency --

15              THE COURT:  Yeah.

16              MR. OSEN:  -- which is usually their way of

17    saying, Do it the way we want it --

18              THE COURT:  Right.  Right.

19              MR. OSEN:  -- but here, it really is much more so

20    for the Court than for us.  We can change the captions and

21    add some details.  It wouldn't trouble us greatly, but it

22    makes absolutely no sense for the Court to do this work

23    twice.

24              THE COURT:  Well, look, and your victims don't

25    want to testify twice.  I mean, you know, it -- to the
```

1    extent you're putting -- eventually, when we get on the

2    other side of it, and even your experts and whatnot.

3              MR. OSEN:  Oh, I assure you, the experts are happy

4    to --

5              THE COURT:  Yeah, that's true.  Your experts would

6    show up -- yeah, that's right.  They would show up just

7    about anywhere to give the testimony they're going to give

8    here.

9              All right.  So what I -- what would you suggest I

10   do, then, with the pending motion, just don't address it for

11   now?  It's going to be overtaken by events when we end up

12   getting into the heart of the case.  As far as that pending

13   motion to take judicial notice of certain facts --

14             MR. OSEN:  Oh, yeah --

15             THE COURT:  There's --

16             MR. OSEN:  -- I think that just -- that has --

17             THE COURT:  -- just --

18             MR. OSEN:  You'll take judicial notice if and when

19   you're -- you issue the overall --

20             THE COURT:  Right.

21             MR. OSEN:  -- findings of fact and so forth.

22             THE COURT:  Okay.  Fair enough.  Okay.  So I'll

23   let that go.  I will go ahead and, I think, again, given

24   that I have at least one other case I want to try to set and

25   so actually, you -- I won't, you know -- hopefully, these

1       cases won't be my first FSIA case when it -- when they come.

2       So I'll have been broken in a little bit.  Given that and

3       given that Judge Kotelly has had that case -- that's an

4       older case -- I mean, I think what I'd like to do is use the

5       next little period of time -- I guess, you can get the Field

6       folks -- get service wrapped up there and I'll -- I will put

7       in a minute order and ask you to -- give you plenty of time,

8       you know, 30 or 45 or 60 days -- to just brief this bank

9       issue to, you know, again, just -- it sounds like, actually,

10      it's not the curve ball I really thought it was and

11      particularly here, but I think it would be helpful to, sort

12      of --

13              MR. OSEN:  The only thing I would say, Your Honor,

14      is, because of the likely time frame involved, ordinarily,

15      in a more expedited proceeding where we didn't have Karcher

16      and there wasn't Fields and we were, kind of, just on our

17      own and it was a, sort of, more routine matter, I would say

18      to you that we would either, by expert or by affidavit,

19      submit sufficient evidence to support the claims against the

20      banks.  Based on the fact that we have additional time, I

21      would ask Your Honor to consider whether you'd be open to

22      limited discovery for those claims.  Again, it was probably

23      not necessary.  I can't represent that without it, we can't

24      make our case, but, you know, typically, in an FSIA action,

25      these submissions are based on government findings alone --

1    government records and reports and the like -- and expert

2    testimony and not the actual transactional records involved.

3    If I have time to spare and I am not rushing because I don't

4    have the same prospect of an imminent entry of judgment,

5    then at least a limited opportunity to actually request

6    third-party records is actually of interest because 99

7    percent of this kind of financing is cleared in U.S. dollars

8    which means there is responsive records somewhere in the

9    United States.  Obviously, I can't tell you it's absolutely

10   necessary to be able to satisfy our burden, but if I know

11   that realistically, until Fields, for example, is in the

12   same posture, there's -- and you have another case before

13   this one going, then, you know, I would love to be able to

14   supplement the record to the maximum extent possible.

15           THE COURT:  Is there a -- the only -- so that

16   seems perfectly reasonable to me.  I guess I'd have to see

17   -- you mentioned -- I don't know what the -- as you

18   represented, you couldn't, you know -- you could not

19   represent that it was absolutely necessary to your case.  I

20   don't know.  Is that the -- I don't -- offhanded -- and I

21   don't even know if, in these -- this particular -- these

22   particular cases, the standard is different, but it, you

23   know -- do you know what the -- offhand what the standard is

24   for this kind of third-party discovery?

25           MR. OSEN:  Well, the -- I don't think there's a

```
1      separate standard --

2               THE COURT:  So it's --

3               MR. OSEN:  -- for it.  The issue is that for

4      purposes of an FSIA case, Your Honor has a relaxed

5      evidentiary standard.  It, you know -- so we'll have

6      admissible evidence and, you know, it's sufficient, I think,

7      obviously, to meet that hurdle, but in terms of its

8      relevance and scope, I think what we're talking about is

9      clearly, you know, contemplated in the federal rules.  So I

10     don't think that's the issue.  It's just a question of, you

11     know, you might entertain a greater scope or a longer period

12     or --

13              THE COURT:  Right.

14              MR. OSEN:  -- you know, you might take a different

15     view of objections if they come in knowing that, you know,

16     we're not trying to prove that a specific person, you

17     know -- let's say, a bank officer -- knowingly -- that level

18     of knowledge and so forth isn't required.  So --

19              THE COURT:  Right.

20              MR. OSEN:  -- I would imagine, if that issue came

21     before you, you'd be less -- you would feel the --

22              THE COURT:  Sure.

23              MR. OSEN:  -- issue is less compelling --

24              THE COURT:  Sure.

25              MR. OSEN:  -- to require additional follow-up --
```

```
1              THE COURT:  But that doesn't mean you can't take

2       your shot and --

3              MR. OSEN:  Right.

4              THE COURT:  -- sort of, see what happens.  No,

5       that's fine, then.  I think, given, as you stated, kind of,

6       where we are procedurally on both ends here, I would say

7       file a motion and I'll take it up and you can lay out what

8       discovery you're anticipating you'd like to pursue and I'll

9       take it up promptly.

10             MR. OSEN:  Okay.  Thank you.

11             THE COURT:  So yes.  So we'll wait for the --

12      we'll have Field, hopefully, served by August.  As you

13      mentioned, the pending motion, not critical.  I will do, in

14      a minute order -- ask you to just, sort of, tee up this bank

15      theory.  Not proof, you know?  Not proof --

16             MR. OSEN:  No, I understand, Your Honor.

17             THE COURT:  -- just show, you know -- walk me

18      through what you think you --

19             MR. OSEN:  What the legal elements are --

20             THE COURT:  Yeah, the legal elements.  And if, you

21      know -- I think, in these cases, too -- like you mentioned,

22      not reinventing the wheel -- to the extent you can point us

23      to other cases where they were in a similar posture --

24      obviously, not necessarily with the same posture in terms of

25      the particular --
```

```
 1            MR. OSEN:  Sure.

 2            THE COURT:  -- weapons or, you know, the

 3    particular -- the EFPs, but the same basic posture --

 4            MR. OSEN:  We'll identify cases where

 5    instrumentalities have been involved; have been sued in

 6    their separate capacity; what the elements of proof are

 7    under the statute and the like and --

 8            THE COURT:  Yep, and courts that have found that

 9    that was satisfied.  That, I think, would be -- I think

10    that's worth our time --

11            MR. OSEN:  Absolutely.

12            THE COURT:  -- during this period.  And let us

13    know if anything happens with Judge Kotelly.  And what I'll

14    do, maybe, then, is -- since you mentioned August, why don't

15    I ask you to -- I'll find a date in September to just have

16    you give us a status report.

17            MR. OSEN:  Okay.

18            THE COURT:  The status report could include

19    service and, I assume by that time, I'll have granted your

20    motion for discovery, I anticipate, and you can give, you

21    know -- instead of coming all the way down here, at least on

22    paper, you could give us an update on where discovery is.

23            MR. OSEN:  Sure.

24            THE COURT:  That way, I can -- we can make sure

25    things are percolating ahead and -- but you might not have
```

1    to come all the way down.

2         MR. OSEN:  I appreciate that, Your Honor.  And

3    probably -- I haven't thought this far ahead, but probably,

4    we would submit in our motion for discovery, sort of, a

5    closing date, too, so that it's --

6         THE COURT:  Right.

7         MR. OSEN:  -- not an open-ended --

8         THE COURT:  Yeah.

9         MR> OSEN:  -- proceeding.

10         THE COURT:  No, that's -- that sounds perfect.

11         So I've gone through all of the questions and

12    issues that had come to mind.  Is there anything else you

13    think I need to address?

14         MR. OSEN:  No, I think that covers it all.

15         THE COURT:  Okay.  I appreciate you coming down.

16    As I said, maybe, next time, maybe, right -- say, in

17    September, maybe, right after you anticipate, maybe, having

18    some -- having completed service, I'll ask for a -- I'll

19    issue an order in all the cases asking for, kind of, an

20    update.  We'll get an update on discovery; we'll see where

21    Judge Kotelly is; and we'll, kind of, go from there.

22         MR. OSEN:  Right.  Thank you very much, Your

23    Honor.

24         THE COURT:  Absolutely.  If there's nothing

25    further, then, counsel's dismissed.

```
1          MR. OSEN:  Okay.  Thank you.

2          THE DEPUTY CLERK:  All rise.  This Honorable Court

3     is in recess.

4          (Proceedings concluded at 10:47 a.m.)

5                    * * * * * * * * * * * *

6              CERTIFICATE OF OFFICIAL COURT REPORTER

7     I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

8     that the above and foregoing constitutes a true and accurate

9     transcript of my stenographic notes and is a full, true and

10    complete transcript of the proceedings to the best of my

11    ability, dated this 10th day of September 2018.

12                          /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                            Official Court Reporter
13                          United States Courthouse
                            Room 6722
14                          333 Constitution Avenue, NW
                            Washington, DC 20001
15

16

17

18

19

20

21

22

23

24

25
```